Joel E. Elkins (SBN 256020)
Email: jelkins@weisslawllp.com
**WEISSLAW LLP**
9107 Wilshire Blvd, Suite 450
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile: 310/209-2348

*Attorneys for Plaintiff Karen Hight*

*[Additional Counsel Listed Below]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREN HIGHT, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VCA INC., ROBERT L. ANTIN, JOHN M. BAUMER, JOHN B. CHICKERING, JR., JOHN HEIL, FRANK REDDICK, MMI HOLDINGS, INC., VENICE MERGER SUB INC., and MARS, INCORPORATED,<br><br>Defendants. | Case No. _____<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>JURY TRIAL DEMANDED |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff, by her undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action stems from a proposed transaction announced on January 9, 2017 (the "Proposed Transaction"), pursuant to which VCA Inc. ("VCA" or the "Company") will be acquired by MMI Holdings, Inc. ("Parent"), Venice Merger Sub Inc. ("Merger Sub"), and Mars, Incorporated (together with Parent and Merger Sub, "Mars").

2.      On January 7, 2017, VCA's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Mars.  Pursuant to the terms of the Merger Agreement, shareholders of VCA will receive $93.00 in cash for each share of VCA common stock.

3.      On February 3, 2017, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.     This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of VCA common stock.

9.     Defendant VCA is a Delaware corporation and maintains its principal executive offices at 12401 West Olympic Boulevard, Los Angeles, California

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

90064.  VCA's common stock is traded on the NasdaqGS under the ticker symbol "WOOF."

10.     Defendant Robert L. Antin ("Antin") has served as a director, Chairman, President, and Chief Executive Officer ("CEO") of VCA since 1986.

11.     Defendant John M. Baumer ("Baumer") has served as a director of VCA since September 2000.  According to the Company's website, Baumer is a member of the Audit Committee, the Compensation Committee, and the Nominating & Corporate Governance Committee.

12.     Defendant John B. Chickering, Jr. ("Chickering") has served as a director of VCA since April 2004 and previously served as a director from 1988 to 2000.  According to the Company's website, Chickering is Chair of the Audit Committee, Chair of the Compensation Committee, and Chair of the Nominating & Corporate Governance Committee.

13.     Defendant John Heil ("Heil") has served as a director of VCA since February 2002 and previously served as a director from 1995 to 2000.  According to the Company's website, Heil is a member of the Audit Committee.

14.     Defendant Frank Reddick ("Reddick") has served as a director of VCA since February 2002.

15.     The defendants identified in paragraphs 10 through 14 are collectively referred to herein as the "Individual Defendants."

- 4 -
COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

16.     Defendant Parent is a Delaware corporation and a party to the Merger Agreement.

17.     Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

18.     Defendant Mars, Incorporated is a Delaware corporation and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action on behalf of herself and the other public stockholders of VCA (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

20.     This action is properly maintainable as a class action.

21.     The Class is so numerous that joinder of all members is impracticable. As of January 6, 2017, there were approximately 81,573,526 shares of VCA common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

22.     Questions of law and fact are common to the Class, including, among others, whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

23.     Plaintiff is committed to prosecuting this action and has retained

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

24.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

25.    Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company*

26.    VCA is a leading provider of pet health care services in the country delivered through nearly 800 small animal veterinary hospitals in the U.S. and Canada, a preeminent nationwide clinical laboratory system that services all fifty states and Canada (Antech Diagnostics), the leading animal diagnostic imaging

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

company in the market (Sound), and Camp Bow Wow, the nation's Premier Doggy Day and Overnight Camp® franchise.

27.     On October 26, 2016, VCA issued a press release wherein it reported its financial results for the third quarter ended September 30, 2016.  The Company reported that revenue increased 19.1% to a third quarter record of $656.9 million; gross profit increased 13.7% to $156.6 million; and operating income increased 10.2% to $107.0 million.  Net income increased 6.2% to $58.2 million, and diluted earnings per common share increased 6.0% to $0.71.  Additionally, non-GAAP operating income increased 19.8% to $117.8 million; non-GAAP net income increased 15.7% to $64.4 million; and non-GAAP diluted earnings per common share increased 16.2% to $0.79.

28.     In the October 26, 2016 press release, VCA also reported its financial results for the nine months ended September 30, 2016.  Revenue increased 17.1% to $1.9 billion, and gross profit increased 16.5% to $457.3 million.  Operating income increased 17.4% to $309.1 million; net income increased 14.3% to $168.5 million; and diluted earnings per common share increased 15.7% to $2.06.  On a non-GAAP basis, gross profit increased 17.8% to $482.1 million; operating income increased 22.8% to $339.1 million; net income increased 21.7% to $188.8 million; and diluted earnings per common share increased 22.9% to $2.31.

29.     With respect to the results, Individual Defendant Antin, Chairman and

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

CEO of the Company, commented:

> We had an outstanding quarter highlighted by 16.2% growth in our adjusted diluted earnings per common share.   We continue to experience healthy organic revenue growth and increasing gross margins in both our core Animal Hospital and Laboratory businesses. Given our results relative to our expectations and our future acquisition pipeline, we remain optimistic with respect to our results for the full year ended December 31, 2016.

30.    Antin continued:

> Animal Hospital revenue in the third quarter increased 25.2%, to $553.4 million, driven by acquisitions made during the past 12 months and same-store revenue growth of 5.4%.  Our same-store gross profit margin increased 50 basis points to 17.5%, and our total gross margin remained flat at 17.0%. Excluding acquisition-related amortization expense, our Non-GAAP same-store gross profit margin increased 40 basis points to 18.4%; and Non-GAAP Animal Hospital total gross profit margin increased 50 basis points to 18.5%. During the 2016 third quarter, we acquired 12 independent animal hospitals which had historical combined annual revenue of $38 million bringing our year to date total, excluding CAPNA, to 49 independent animal hospitals with historical combined annual revenue of $146 million.

> Our Laboratory internal revenue in the third quarter increased 5.5% to $105.1 million; laboratory gross profit margin increased 40 basis points to 51.6% and our operating margin increased 60 basis points to 42.3%. Excluding acquisition-related amortization expense, Non-GAAP Laboratory gross profit increased 20 basis points to 51.9%; and Non-GAAP Laboratory operating margin increased 60 basis points to 42.7%.

### Background of the Proposed Transaction

31.    As set forth in the Proxy Statement, the Proposed Transaction is the result of a flawed, essentially single-bidder process.

32.    On November 11, 2016, Grant F. Reid ("Reid"), CEO of Mars,

- 8 -
COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

contacted Individual Defendant Antin, and Reid and Antin met telephonically the following day.

33.    On November 14, 2016, Antin, Reid, and Claus Aagaard ("Aagaard"), Chief Financial Officer of Mars, met for dinner, and Reid and Aagaard outlined a proposal pursuant to which Mars would acquire all of the capital stock of the Company for $90 per share in cash.  Reid and Aagaard informed Antin that, following such a transaction, Antin would retain his position as CEO of the company, and the rest of VCA's leadership team would remain intact.

34.    The following morning, Antin, Reid, and Aagaard met again to discuss the proposed merger.

35.    On November 18, 2016, Mars memorialized its offer in writing, again indicating that the post-merger company would "continue to be managed by its current senior management team, including [Mr. R. Antin]."

36.    On November 29, 2016, Antin, Reid, and Aagaard met and discussed the "cultures of the Company and Mars."

37.    Over the next several weeks, the Company continued negotiations with its chosen acquiror regarding the Proposed Transaction, and on December 24, Mars revised its proposal to $93.00 per share – the ultimate merger consideration.

38.    On January 7, 2017, the Individual Defendants approved the Proposed Transaction, and the parties executed the Merger Agreement that day.

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

39.    The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 6.3(a) of the Merger Agreement states:

(a) Except as expressly permitted by this Section 6.3, the Company shall, and shall cause each of its Subsidiaries to, and shall use its reasonable best efforts to cause its and its Subsidiaries' Representatives: (i) to immediately cease and cause to be terminated any solicitation, encouragement, discussions or negotiations with any persons (other than Parent and its Subsidiaries (including Acquiror) and their respective Representatives) that may be ongoing with respect to a Company Takeover Proposal and (ii) not to, directly or indirectly, (A) solicit, initiate, knowingly encourage or knowingly facilitate any inquiries regarding, or the making of any proposal or offer that constitutes, or would reasonably be expected to lead to, a Company Takeover Proposal, (B) engage in, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any other person any information in connection with or for the purpose of soliciting, initiating, knowingly encouraging or knowingly facilitating, a Company Takeover Proposal (other than (x) solely in response to an unsolicited inquiry, to refer the inquiring person to the terms of this Section 6.3 and to limit its communication exclusively to such referral or (y) upon receipt of a bona fide, unsolicited written Company Takeover Proposal from any person that did not result from a breach of this Section 6.3, solely to the extent necessary to ascertain facts or clarify terms with respect to a Company Takeover Proposal for the Company Board of Directors to be able to have sufficient information to make the determination described in Section 6.3(c)), (C) approve, adopt, publicly recommend or enter into, or publicly propose to approve, adopt, recommend or enter into, any letter of intent or similar document, agreement, commitment, or agreement in principle (whether written or oral, binding or nonbinding) with respect

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

to a Company Takeover Proposal (other than an Acceptable Confidentiality Agreement entered into in accordance with Section 6.3(c)), (D) take any action to make the provisions of any "fair price," "moratorium," "control share acquisition," "business combination" or other similar anti-takeover statute or regulation (including any transaction under, or a third party becoming an "interested stockholder" under, Section 203 of the DGCL) inapplicable to any person (other than Acquiror and its Affiliates) or to any transactions constituting or contemplated by a Company Takeover Proposal, (E) otherwise cooperate with or assist or participate in any such inquiries, proposals, offers, discussions or negotiations or (F) resolve or agree to do any of the foregoing. The Company shall not, and shall cause its Subsidiaries not to, release any third party from, or waive, amend or modify any provision of, or grant permission under, or knowingly fail to enforce, any confidentiality obligations with respect to a Company Takeover Proposal or similar matter or any standstill provision in any agreement to which the Company or any of its Subsidiaries is a party; provided, that, prior to the time the Company Stockholder Approval is obtained, but not after, the Company may waive any standstill or similar provisions to the extent necessary to permit a person or group to make, on a confidential basis to the Company Board of Directors, a Company Takeover Proposal, conditioned upon such person agreeing to disclosure of such Company Takeover Proposal to Acquiror, in each case as contemplated by this Section 6.3 (provided, further, that the Company may only take such action if the Company Board of Directors determines in good faith (after consultation with its outside financial advisor and outside legal counsel) that the failure of the Company Board of Directors to take such action would reasonably be expected to be inconsistent with its fiduciary duties under applicable Law). None of the Company or its Subsidiaries shall enter into any confidentiality agreement or other agreement subsequent to the date hereof which prohibits the Company or any of its Subsidiaries from (x) providing to Acquiror or any of its Affiliates or Representatives the information required to be provided pursuant to this Section 6.3 or (y) otherwise complying with this Section 6.3. The Company and Acquiror hereby agree that all standstill or similar provisions in the Confidentiality Agreement shall, as of the date of this Agreement, terminate and be of no further force and effect.

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

40.    Further, the Company must promptly advise Mars of any proposals or

inquiries received from other parties.  Section 6.3(d) of the Merger Agreement

states:

> (d) Without limiting the foregoing, the Company shall as promptly as
> practicable (and in any event within twenty-four (24) hours after
> receipt) notify Acquiror in the event that the Company or any of its
> Representatives receives a Company Takeover Proposal or a request
> for information relating to the Company or its Subsidiaries that
> constitutes or contemplates a Company Takeover Proposal, including
> the identity of the person making the Company Takeover Proposal
> and a description of the material terms and conditions thereof. The
> Company shall keep Acquiror reasonably informed, on a reasonably
> current basis, as to the status of (including any developments,
> discussions or negotiations) such Company Takeover Proposal
> (including by as promptly as practicable (and in any event within
> twenty-four (24) hours after receipt) providing to Acquiror a
> description of any changes to the material terms and conditions of
> such Company Takeover Proposal).

41.    Moreover, the Merger Agreement contains a highly restrictive

"fiduciary out" provision permitting the Board to withdraw its approval of the

Proposed Transaction under extremely limited circumstances, and grants Mars a

"matching right" with respect to any "Company Superior Proposal" made to the

Company.  Section 6.3(f) of the Merger Agreement provides:

> (f) Anything to the contrary set forth in this Agreement
> notwithstanding, prior to the time that the Company Stockholder
> Approval is obtained, but not after, the Company Board of Directors
> may, with respect to a bona fide, unsolicited Company Takeover
> Proposal that did not result from a breach of this Section 6.3, make an
> Adverse Recommendation Change or cause the Company to terminate
> this Agreement in accordance with Section 8.1(g) in order to
> substantially concurrently with such termination enter into a definitive

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

agreement relating to such Company Takeover Proposal if and only if, prior to taking either such action, (i) the Company has complied with its obligations under this Section 6.3, (ii) the Company Board of Directors has determined, in good faith, after consultation with its outside financial advisor and outside legal counsel, that such Company Takeover Proposal constitutes a Company Superior Proposal and (iii) the Company Board of Directors determines, in good faith, after consultation with its outside financial advisor and outside legal counsel, that the failure to do so would reasonably be expected to be inconsistent with its fiduciary duties under applicable Law; provided , that prior to making such Adverse Recommendation Change or effecting such termination (and prior to making the determination set forth in clause (iii)), (A) the Company has given Acquiror at least five (5) Business Days' prior notice of its intention to take such action, specifying the reasons therefor, including the terms and conditions of, and the identity of the person making, any such Company Takeover Proposal and has contemporaneously provided to Acquiror a copy of the Company Takeover Proposal and a copy of any proposed Company Acquisition Agreements and a copy of any financing commitments relating thereto (or, in each case, if not provided in writing to the Company, a written summary of the terms and conditions thereof), (B) the Company shall have negotiated, in good faith, with Acquiror and its Representatives during such notice period (if, and to the extent, Acquiror has indicated its desire to negotiate to the Company) to enable Acquiror to propose revisions to the terms of this Agreement such that it would cause such Company Takeover Proposal to no longer constitute a Company Superior Proposal, (C) following the end of such notice period, the Company Board of Directors shall have considered, in good faith, any revisions to the terms of this Agreement proposed in writing by Acquiror (and not revoked), and shall have determined, in good faith, after consultation with its outside financial advisor and outside legal counsel, that the Company Takeover Proposal would nevertheless continue to constitute a Company Superior Proposal if the revisions proposed in writing by Acquiror (and not revoked) were to be given effect and (D) in the event of any change to any of the financial terms (including the form, amount, mix and timing of payment of consideration) or any other material terms of such Company Takeover Proposal, the Company shall, in each case, have delivered to Acquiror an additional notice consistent with that described in clause (A) above

- 13 -

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

of this proviso and a new notice period under clause (A) of this proviso shall commence (except that the five (5) Business Day notice period referred to in clause (A) above of this proviso shall instead be equal to the longer of (x) three (3) Business Days and (y) the period remaining under the notice period under clause (A) of this proviso immediately prior to the delivery of such additional notice under this clause (D)) during which time the Company shall be required to comply with the requirements of this Section 6.3(f) anew with respect to such additional notice, including clauses (A) through (D) above of this proviso; provided, however, that the Company shall not terminate this Agreement pursuant to this Section 6.3(f) and Section 8.1(g) unless the Company pays, or causes to be paid, to Acquiror the Termination Fee pursuant to Section 8.3(c) prior to or concurrently with such termination. Anything to the contrary contained herein notwithstanding, neither the Company nor any of its Subsidiaries shall enter into any Company Acquisition Agreement unless this Agreement has been terminated in accordance with its terms.

42.    Further locking up control of the Company in favor of Mars, the Merger Agreement provides for a "termination fee" of $275,000,000, payable by the Company to Mars if the Individual Defendants cause the Company to terminate the Merger Agreement.

43.    By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

44.    Additionally, Individual Defendant Antin and Arthur J. Antin, one of the Company's founders and its current Chief Operating Officer, Senior Vice President, and Secretary, have entered into a voting agreement pursuant to which they have agreed to vote their Company shares in favor of the Proposed

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Transaction.  Accordingly, such shares are already locked up in favor of the merger.

45.    The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

46.    Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

47.    Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

48.    Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

49.    For example, Individual Defendant Antin will retain his employment position following the close of the Proposed Transaction, and the remainder of the Company's management will continue to run the company.

50.    Further, Antin stands to receive *$70,628,403* in connection with the Proposed Transaction, while the Company's other named executive officers stand to receive $44,909,109.

**The Proxy Statement Omits Material Information, Rendering It False and Misleading**

51.    Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

52.    The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

53.    The Proxy Statement omits material information regarding the Company's financial projections and the financial analyses performed by the Company's financial advisor, Barclays Capital Inc. ("Barclays"), in support of its so-called fairness opinion.

54.    For example, with respect to VCA's financial projections, the Proxy Statement fails to disclose:  (i) a reconciliation of all non-GAAP to GAAP metrics; (ii) tax-affected adjusted earnings before interest, tax expense, and amortization; (iii) interest; (iv) tax expense and amortization; (v) expected stock-based compensation; (vi) depreciation and amortization of purchased intangibles deductible for tax purposes; (vii) capital expenditures; (viii) changes in working capital; (ix) integration costs incurred in connection with business combinations; (x) unusual or non-recurring losses or expenses; (xi) charges resulting from foreign exchange losses; (xii) expenses related to equity offerings or acquisitions, recapitalizations, divestitures, or asset sales; (xiii) minority interests; and (xiv) interest income.

55.    With respect to Barclays' *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose:  (i) the range of calculated terminal values of the Company as of December 31, 2021; (ii) the inputs and assumptions used to

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

determine the discount rate range of 8.0% to 10.0%; and (iii) the fully diluted number of shares as of January 6, 2017 as provided by the Company's management.

56.    With respect to Barclays' *Selected Precedent Transaction Analysis*, the Proxy Statement fails to disclose the individual multiples and metrics for the transactions observed by Barclays in its analysis.

57.    With respect to Barclays' *Selected Comparable Company Analysis*, the Proxy Statement fails to disclose the individual multiples and metrics for the companies observed by Barclays in its analysis.

58.    When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

59.    The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Background of the Merger"; (ii) "Reasons for the Merger"; (iii)

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

"Recommendation of the Company's Board of Directors"; (iv) "Opinion of the Financial Advisor to the Company"; and (v) "Projected Financial Information."

60.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to VCA's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and VCA**

61.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

62.     The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  VCA is liable as the issuer of these statements.

63.     The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

64.     The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

65.     The omissions and false and misleading statements in the Proxy

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

66.    The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

67.    By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

68.    Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Mars

69.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

70.    The Individual Defendants and Mars acted as controlling persons of VCA within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of VCA and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

71.    Each of the Individual Defendants and Mars was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

72.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Proxy Statement.

73.    Mars also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

74.    By virtue of the foregoing, the Individual Defendants and Mars violated Section 20(a) of the 1934 Act.

75.    As set forth above, the Individual Defendants and Mars had the ability

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

to exercise control over and did control a person or persons who have each violated

Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as

alleged herein.  By virtue of their positions as controlling persons, these defendants

are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate

result of defendants' conduct, plaintiff and the Class are threatened with

irreparable harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.    Preliminarily and permanently enjoining defendants and all persons

acting in concert with them from proceeding with, consummating, or closing the

Proposed Transaction;

B.    In the event defendants consummate the Proposed Transaction,

rescinding it and setting it aside or awarding rescissory damages;

C.    Directing the Individual Defendants to disseminate a Proxy Statement

that does not contain any untrue statements of material fact and that states all

material facts required in it or necessary to make the statements contained therein

not misleading;

D.    Declaring that defendants violated Sections 14(a) and/or 20(a) of the

1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.    Awarding plaintiff the costs of this action, including reasonable

- 21 -

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

1  allowance for plaintiff's attorneys' and experts' fees; and

2

3      F.      Granting such other and further relief as this Court may deem just and

4  proper.

5                              **JURY DEMAND**

6

7      Plaintiff respectfully requests a trial by jury on all issues so triable.

8  Dated: February 15, 2017              **WEISSLAW LLP**

9                              By:

10 **OF COUNSEL:**                       Joel E. Elkins

11                                       9107 Wilshire Blvd., Suite 450
   **RIGRODSKY & LONG, P.A.**            Beverly Hills, CA 90210
12 Seth D. Rigrodsky                     Telephone:  310/208-2800
   Gina M. Serra                         Facsimile:   310/209-2348
13 2 Righter Parkway, Suite 120
14 Wilmington, DE 19803                  *Attorneys for Plaintiff*
   Telephone: (302) 295-5310
15 Fax: (302) 654-7530

16

17

18

19

20

21

22

23

24

25

26

27

28

                              - 22 -